**IN THE UNITED STATES DISCTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VIVIAN BETTENCOURT | : | |
| 4715 Walnut Street, Apt 314 | : | |
| Philadelphia, PA 19139 | : | CIVIL ACTION |
| | : | |
|     Plaintiff, | : | CASE NO.: |
| | : | |
|     v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| THE BOSTON CONSULTING | : | |
| GROUP, INC. | : | |
| d/b/a Boston Consulting Group | : | |
| 200 Pier 4 Boulevard | : | |
| Boston, MA, 02210 | : | |
| | : | |
|     Defendant. | : | |
| | : | |

**<u>CIVIL ACTION COMPLAINT</u>**

Vivian Bettencourt (hereinafter referred to as "Plaintiff "unless indicated otherwise), by and through her undersigned counsel, hereby avers as follows:

**<u>INTRODUCTION</u>**

1.      This action has been initiated by Plaintiff against Defendant The Boston Consulting Group, Inc., d/b/a Boston Consulting Group (hereinafter referred to as "Defendant" unless indicated otherwise) for violation of the Americans with Disabilities Act, as amended ("ADA" - 42 USC §§ 12101, et. seq.), the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §2601 et seq.), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981, the Pennsylvania Human Relations Act ("PHRA") and the Philadelphia Fair Practices Ordinance ("PFPO").[1]

---

[1] Plaintiff's claims under the PHRA and PFPO are referenced herein for notice purposes. Plaintiff intends to amend her complaint to include claims pending before the Pennsylvania Human Relation Commission ("PHRC") and Philadelphia Commission on Human Relations ("PCHR") once such claims are fully and administratively exhausted. Plaintiff has commenced this action at this time because she has received a Notice of Right to Sue from the EEOC with respect to her other claims. Plaintiff's PHRA and PFPO claims, once exhausted, will mirror the ADA/Title VII/1981 claims asserted herein.

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§1331 and 1343(a)(4) because it arises under laws of the United States and seeks redress for civil rights violations under Title VII.

3.      This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

4.      Pursuant to 28 U.S.C. §1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

5.      Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff has properly exhausted her administrative proceedings before initiating this action by timely filing her Charge with the EEOC, and by filing the instant lawsuit within 90 days of receiving a right-to-sue letter from the EEOC.

## PARTIES

6.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.      Plaintiff is an adult individual, with an address as set forth in the caption.

8.      Defendant The Boston Consulting Group, Inc., d/b/a Boston Consulting Group is a global management consulting firm, headquartered in Boston, it advises business and government leaders on strategy, digital transformation, and sustainable competitive advantage.

9.    At all times relevant herein, Defendant acted by and through its agents, servants and/or employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

10.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11.    Plaintiff is a 31-year-old female of mixed and South Asian descent who identifies as queer.

12.    Plaintiff initially began working for Defendant in or around mid-to-late April 2024 in a temporary capacity and, thereafter, was hired as a direct employee on or about June 17, 2024.

13.    In total, Plaintiff was employed by Defendant for approximately one-and-a-half (1.5) years as a direct employee, until her unlawful termination on or about January 15, 2026.

14.    Plaintiff was employed by Defendant as an Office Experience and Events Assistant.

15.    At all times relevant herein, Plaintiff was deemed employed from and based within Defendant's Philadelphia, Pennsylvania location, located at 1735 Market Street, Suite 4000, Philadelphia, Pennsylvania 19103.

16.    Plaintiff was supervised by Operations Director - Wandy DeVeaux (hereinafter "DeVeaux").

17.    During Plaintiff's employment, she was a hard-working employee and performed her job responsibilities in a professional and highly competent manner.

18.    Plaintiff was praised for her performance, issued positive performance reviews and raises.

19.     For the first 16 (out of 18) months of employment, Plaintiff was not issued any formal discipline.

### -ADA/FMLA Discrimination-

20.     Plaintiff has and continues to suffer from ADA-qualifying disabilities, including but not limited to Anxiety, Depression, Post-Traumatic-Stress-Disorder ("PTSD"), Attention-deficit/hyperactivity disorder ("ADHD"), a sleep disorder, and other related medical conditions/complications.

21.     As a result of the aforesaid disabilities and serious health conditions, Plaintiff has experienced and continues to experience symptoms, impairments, and limitations including, *inter alia*, hopelessness, anxiety, sleeplessness, panic, difficulty learning, thinking, concentrating, focusing, communicating, speaking, interacting with others, caring for herself, regulating emotions, and, at times, working.

22.     Plaintiff has and continues to obtain mental health/medical treatment for these conditions.

23.     Despite her health conditions and limitations, Plaintiff remained fully capable of performing the essential functions of her job.

24.     Defendant's management, including DeVeaux, was aware of Plaintiff's disabilities because Plaintiff disclosed the same to DeVeaux in or around the summer of 2024.

25.     In fact, during the course of her employment, Plaintiff routinely discussed her disabilities/medical conditions and need for reasonable accommodations with DeVeaux.

26.     Throughout the first half of 2025, Defendant experienced significant understaffing issues. By way of example only, three (3) consecutively hired individuals either failed to report to work or never commenced employment altogether.

27.    Defendant was struggling to obtain and retain foundational staffing support during this period.

28.    As a result of the aforesaid understaffing, Plaintiff was regularly required to "wear many hats," perform the work of multiple employees, and undertake substantial additional responsibilities *beyond the normal expectations* of her role.

29.    The work environment during this timeframe was exceptionally stressful, chaotic, and demanding.

30.    During the first half of 2025, Plaintiff was also experiencing significant medical flareups, exacerbations, and worsening symptoms related to her disabilities and health conditions, with the stressful work environment serving as a substantial contributing factor thereto.

31.    Among other things, Plaintiff discussed with DeVeaux that she was periodically arriving slightly late to work due to medical complications associated with her disabilities and health conditions and asked if DeVeaux could work with her on this issue.

32.    Instead of engaging in a supportive or interactive accommodation process, DeVeaux was critical of Plaintiff's disability-related lateness and admonished Plaintiff regarding the same through both verbal comments and written communications, including via email.

33.    Defendant failed to properly advise Plaintiff that periodic disability-related lateness could constitute a reasonable accommodation and/or protected intermittent leave under the Family and Medical Leave Act ("FMLA").

34.    Instead, Plaintiff was only presented with the option of Short-Term Disability leave and was not meaningfully advised regarding intermittent leave protections or accommodation-related protections concerning periodic disability-related lateness.

35.     Instead of accommodating Plaintiff's disabilities-related needs, DeVeaux punished Plaintiff by changing her scheduled reporting time from 8:00 a.m. to 7:30 a.m., despite knowing Plaintiff was already experiencing periodic medical difficulties impacting punctuality.

36.     Despite the foregoing, Plaintiff continued to work extremely hard, including at times working overtime, while attempting to efficiently perform the work and responsibilities that would ordinarily be expected from multiple employees.

37.     In or around May and June 2025, Plaintiff informed DeVeaux that her health conditions were worsening, that she may periodically require brief focus or recovery breaks, and that she was considering taking a medical leave of absence.

38.     In response, DeVeaux told Plaintiff that if she (Plaintiff) took a medical leave, it would create *operational difficulties* for the company.

39.     Plaintiff reasonably believed that a medical leave of absence constituted a protected medical accommodation and/or protected leave under the FMLA and therefore believed Defendant would support her need to obtain medical treatment and recovery.

40.     Instead, DeVeaux expressed frustration, annoyance, and concern regarding the possibility of Plaintiff taking a medical leave of absence due to staffing shortages and workplace demands.

41.     More specifically, DeVeaux informed Plaintiff that if Plaintiff elected to take a medical leave of absence, DeVeaux would *consider the impact of such leave upon the company*, the duration of Plaintiff's leave, and *the burden* upon the team in evaluating Plaintiff's performance and employment standing.

42.     In or about June and July 2025, Plaintiff questioned whether taking a medical leave of absence could negatively impact her job security or performance evaluation.

43. In response, DeVeaux reiterated that Plaintiff's leave, the length thereof, and the operational impact upon the company *would all be considered* in connection with Plaintiff's performance and continued employment.

44. As a result of the foregoing statements and concerns regarding her job security and financial stability, Plaintiff delayed taking a medical leave of absence despite her worsening medical conditions and need for treatment and recovery.

45. Throughout approximately May through July 2025, DeVeaux conducted regular weekly one-on-one meetings with Plaintiff during which DeVeaux's tone, demeanor, criticism, and interactions toward Plaintiff were hostile, dismissive and negative. Such meetings frequently focused on Plaintiff's performance, workload, and/or perceived deficiencies despite ongoing staffing shortages, Plaintiff's disabilities, and known health-related issues. As a result of these interactions, Plaintiff was regularly left visibly upset and, on multiple occasions, left such meetings crying.

46. In or about July 2025, Plaintiff raised concerns regarding DeVeaux's discriminatory statements and conduct to Human Resources ("HR") Senior Manager -  Christina Annunziato (hereinafter "Annunziato"), including telling her about the negative comments DeVeaux made about Plaintiff's request for medical leave.

47. Annunziato advised Plaintiff that the company was "not supposed to hold accommodations or medical leave against [her]."

48. Plaintiff shared with Annunziato her concerns that DeVeaux was improperly treating her disabilities, accommodations, and need for medical leave as negative factors in connection with her employment status.

7

49.     Thereafter, in or about early July 2025, Plaintiff received a largely positive performance review.

50.     The aforesaid performance review reflected that Plaintiff was progressing as expected for her tenure and was on track for a solid performance year.

51.     The performance review also reflected improvement in Plaintiff's functionality after her reporting time was changed back to 8:00 a.m.

52.     As of early July 2025: (a) Plaintiff had already been converted from a temporary worker into a direct employee due to her performance; (b) Plaintiff had never received any formal discipline; and (c) Plaintiff had received the aforesaid positive performance review.

53.     Thereafter, Plaintiff's health deteriorated to the point where she needed to take a medical leave of absence, despite the prior discouraging statements and admonitions from DeVeaux.

54.     Plaintiff commenced a medical leave of absence on or about July 25, 2025.

55.     In the one year preceding this medical leave, Plaintiff worked at least 1,250 hours with Defendant.

56.     Plaintiff provided Defendant (via Defendant's third-party FMLA administrator) with requested medical information and documentation in support of her need for medical leave.

57.     Plaintiff took this FMLA-qualifying medical leave from on or about July 25, 2025 to on or about October 13, 2025.

58.     Plaintiff returned from medical leave on or about October 13, 2025, following an approximate twelve (12) week leave period.

59.     On or about October 13, 2025, *the same day* Plaintiff returned to work from FMLA leave, Defendant issued Plaintiff a Performance Improvement Plan ("PIP") dated on or about

October 22, 2025, purportedly affording Plaintiff ninety (90) days to improve, notwithstanding Plaintiff's recent protected leave and/or medical-related absences.

60. The aforesaid PIP constituted the first formal discipline Plaintiff had received during her employment with Defendant.

61. The PIP contained vague, subjective, inaccurate, exaggerated, and/or untrue criticisms and expectations.

62. The PIP was issued to Plaintiff right after she took FMLA/medical leave and shortly after DeVeaux made derogatory comments about Plaintiff's accommodation needs.

63. In addition, upon Plaintiff's return from medical/FMLA leave, DeVeaux complained to Plaintiff that she (DeVeaux) had been required to cover for Plaintiff during her leave, that she could not even pick up her own daughter at times because she was busy covering Plaintiff's responsibilities, that Plaintiff had been "inconsiderate" for taking FMLA leave and that *Plaintiff's leave negatively impacted the entire team*.

64. In or about October 2025, Plaintiff relayed concerns to Annunziato regarding the PIP and her belief that the PIP was unwarranted.

65. During the PIP period, Defendant obtained additional staffing support.

66. Despite the unwarranted nature of the PIP, Plaintiff continued to perform her duties well and worked hard to satisfy Defendant's expectations.

67. Throughout the fall of 2025, DeVeaux continued to make negative comments to Plaintiff about her disabilities and accommodation needs, including but not limited to, admonishing Plaintiff for utilizing her full work breaks during busy periods despite Plaintiff explaining that fully utilizing such breaks assisted with focus, therapy, symptom management, and medical recovery associated with her disabilities and health conditions.

9

68.     As a result of this ongoing mistreatment, Plaintiff continued to express concerns of disability-related discrimination to DeVeaux and Annunziato.

69.     However, Defendant failed to address or remedy the discrimination.

### - Race/National Origin/Gender/Identity Retaliation-

70.     In or about the fall of 2025, Plaintiff also raised concerns to HR about Joan Hill (Caucasian – hereinafter - "Hill"), a co-worker, who Plaintiff believed engaged in discriminatory conduct and/or made discriminatory comments relating to race, national origin, gender identity, disability, and/or other protected characteristics directed toward Plaintiff and/or others.

71.     For example, but not intending to be exhaustive:

   a.   Beginning in or about September 2024 and continuing thereafter, Hill made remarks reflecting stereotypes, bias, and/or derogatory views concerning individuals of certain races and ethnicities, including Asian, South Asian, and Black individuals.

   b.   In or around late 2024, immediately following a conversation with Linda (Last Name Unknown), an employee of Asian descent, Hill turned toward Plaintiff, *who is also of Asian descent*, and asked whether the individual she was talking to was Linda or another employee of Asian descent, Claire (Last Name Unknown). Hill further stated "I can't tell them apart." Plaintiff perceived the aforesaid comment as discriminatory and/or reflective of racial and national origin-based stereotyping.

   c.   In or about late 2024 and/or early 2025, Hill made comments to Plaintiff concerning an individual who identified as nonbinary. Despite knowing Plaintiff identified as queer and actively participated in Defendant's LGBTQ+ community initiatives,

Hill stated, that she "needed a counselor who knows who they are," implying that individuals identifying as nonbinary lacked certainty regarding their identity.

d. Plaintiff further complained about comments made by Hill concerning another employee's Black nephew, wherein Hill referred to the child as a "monkey" and/or stated that the child "looked like a monkey."

e. Hill also engaged in inappropriate commentary concerning coworkers' appearance, including comments Plaintiff perceived as mocking and/or demeaning culturally associated hairstyles, including braids worn by employees, which Plaintiff understood to be connected to race, ethnicity, and/or cultural identity. Additionally, upon information and belief, Hill shared a photograph of another employee in a derogatory manner without such employee's knowledge or consent.

f. In or around the end of October 2025, Hill referred to one Asian employee by the name of another Asian employee.  After being confronted regarding the aforesaid conduct, Hill responded that the employee needed to "get over [themself]" and further stated, "Do you know how many people call me the wrong name?"

72. At or about the end of 2024, Plaintiff raised concerns regarding Hill's discriminatory conduct to management, including DeVeaux, however, Plaintiff's concerns were minimized, characterized as misunderstandings and/or unintentional comments, and not meaningfully addressed

73. On or about January 15, 2026, just hours prior to her termination, Plaintiff again raised multiple complaints and concerns regarding discrimination, retaliation, accommodations, and workplace conduct to management and HR, including DeVeaux and Annunziato.

11

74.     Immediately thereafter, on or about January 15, 2026, Defendant, through DeVeaux and Annunziato, abruptly terminated Plaintiff's employment.

75.     Defendant asserted that Plaintiff was being terminated because she allegedly failed to sufficiently complete the PIP.

76.     However, Plaintiff was terminated several weeks prior to the actual expiration of the purported ninety (90) day PIP period despite that Plaintiff had performed well on the PIP.

77.     Despite allegedly terminating Plaintiff for performance-related reasons or "cause," Defendant nevertheless offered Plaintiff approximately four (4) weeks of severance pay in exchange for Plaintiff executing a release[2] waiving discrimination, retaliation, and related legal claims against Defendant.[3]

78.     Defendant does not maintain a policy requiring severance payments to employees purportedly terminated for deficient performance or cause.

79.     Plaintiff believes and therefore avers that she was discriminated and retaliated against and then terminated because of, inter alia: (a) her actual and/or perceived disabilities and medical conditions; (b) her requests for accommodations; (c) her utilization of protected medical

---

[2] "In order to receive Transition Allowance, you must sign and return the Release attached as Attachment 2 on or before the date set forth below (unless a later date is otherwise agreed/accepted by BCG in writing). In addition to waiving claims against BCG, this document describes a number of obligations during and after your Transition Period. Please know that, in the event of any failure on your part to comply with your obligations to BCG, whether during your active employment, during the Transition Period, or otherwise, we reserve the right to accelerate your Transition Period end date and/or terminate or modify any or all aspects of your Transition Allowance or this memo."

[3] *See Staffieri v. Northwestern Human Servs*., 2013 U.S. Dist. LEXIS 72115 at **14-15 (E.D. Pa. 2013)(an employer who offered severance at the time of termination when policies did not require upon condition of waiving claim supported finding of pretext among other facts); Bartlett v. NIBCO Inc., 2011 U.S. Dist. LEXIS 28072 (N.D. Ind. 2011)(finding that a severance agreement offered contemporaneously to when the employee was terminated was "probative on the issue of whether NIBCO's motive for terminating Bartlett was [false]."); *EEOC v. Republic Servs., Inc.,* 640 F. Supp. 2d 1267 (D. Nev. 2009)(denying summary judgment and considering as evidence in wrongful termination case that a company would offer severance when an employee is supposedly terminated in a manner that doesn't warrant severance per an explicit company policy); *Karl v. City of Mountlake Terrace*, 2011 U.S. Dist. LEXIS 59085 (W.D. Wash. 2011)(severance agreements are admissible in retaliation claims when made contemporaneous to termination, as they are not governed by Fed.R.Evid. 408); *Brandy v. Maxim Healthcare Servs., Inc*., 2012 WL 5268365, at *2 (N.D. Ind. 2012)(holding that severance agreements offered at the time of termination do not fall under Rule 408 because they are offered before a dispute arises, regardless if the employer "anticipated the severance agreement curtailing any potential future litigation.").

leave and/or FMLA leave; (d) her complaints and opposition to discriminatory conduct; and/or (e) her protected complaints regarding discriminatory conduct by Hill and others.

**COUNT I**
**Violations of the Americans with Disabilities Act, as Amended ("ADA")**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Failure to Accommodate; [3] Retaliation; and [4] Hostile Work Environment)**

80. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

81. Plaintiff suffered from qualifying health conditions under the ADA which affected her ability (at times) to perform some daily life activities.

82. Despite Plaintiff's aforementioned health conditions and limitations, she was still able to perform the duties of her job well with Defendant, however, Plaintiff did require reasonable medical accommodations at times.

83. During the course of her employment, Plaintiff requested reasonable accommodations and/or engaged in protected discussions concerning accommodations, including inter alia: (a) periodic flexibility related to disability-related lateness; (b) focus and recovery breaks; and/or (c) protected medical leave.

84. Defendant failed to reasonably accommodate Plaintiff's disabilities and failed to engage in the interactive process in good faith.

85. Instead, Defendant made blatantly discriminatory comments to Plaintiff regarding her medical conditions and accommodation needs.

86. The discriminatory and retaliatory conduct directed toward Plaintiff included, *inter alia*: (a) criticism regarding disability-related lateness; (b) discouragement from utilizing protected leave; (c) threats that medical leave would negatively impact Plaintiff's performance evaluations and job security; (d) discriminatory comments regarding Plaintiff's leave burdening the team; (e)

13

heightened scrutiny; (f) unwarranted discipline; (g) the issuance of a vague and retaliatory PIP in close temporal proximity to Plaintiff's return from leave; and (h) termination from employment.

87.     Plaintiff also engaged in protected activity by opposing discriminatory conduct and complaining about discriminatory treatment and retaliation directed toward her.

88.     In close temporal proximity to Plaintiff's protected accommodation requests, protected medical leave, and protected complaints, Defendant subjected Plaintiff to materially adverse actions, including the issuance of the PIP, a negative performance evaluation and termination from employment.

89.     Defendant's proffered reasons for its actions were false, pretextual, exaggerated, inconsistent, and/or not worthy of credence.

90.     Plaintiff believes and therefore avers that her disabilities, requests for accommodations and/or complaints of discrimination were motivating and/or determinative factors in Defendant's decision to terminate her employment.

91.     Defendant's actions as aforesaid constitute violations of the ADA.

### COUNT II
### Violations of the Family and Medical Leave Act ("FMLA")
### ([1] Interference; [2] Retaliation)

92.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

93.     After completing one year of employment with Defendant, Plaintiff became an eligible employee under the FMLA and Defendant was an employer subject to the FMLA.

94.     Plaintiff suffered from serious health conditions within the meaning of the FMLA. Plaintiff provided Defendant with notice concerning her serious health conditions, need for leave, and/or need for intermittent flexibility and protected medical absences.

95.     Plaintiff engaged in protected activity under the FMLA by requesting and utilizing protected medical leave and/or requesting protected intermittent leave or flexibility associated with her medical conditions.

96.     Defendant interfered with Plaintiff's FMLA rights by, *inter alia*: (a) discouraging Plaintiff from taking protected leave; (b) threatening Plaintiff that leave usage would negatively impact her performance and job security; (c) failing to properly advise/notify Plaintiff regarding intermittent leave protections; (d) discouraging Plaintiff from taking medical leave; (e) engaging in conduct that dissuaded Plaintiff from taking medical leave and that would dissuade any reasonable person; and (f) considering Plaintiff's protected leave usage as a negative factor in employment-related decisions.

97.     Defendant further retaliated against Plaintiff for exercising rights protected under the FMLA, including via: (a) heightened scrutiny; (b) criticism regarding protected absences and medical needs; (c) the issuance of the PIP shortly after Plaintiff's return from leave; and (d) termination from employment.

98.     Defendant's actions as aforesaid constitute violations of the FMLA.

## COUNT III
### Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")
**(Retaliation)**

99.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

100.    Plaintiff complained regarding comments, conduct, and workplace behavior that Plaintiff reasonably believed reflected discriminatory attitudes, stereotypes, bias, and/or hostility concerning her own and other employees' protected characteristics, including race, national origin, sex, and/or gender identity.

101.    By opposing and reporting such conduct, Plaintiff engaged in protected activity under Title VII.

102.    Shortly after making these complaints, Plaintiff was terminated.

103.    Plaintiff believes and therefore avers that there exists a causal connection between Plaintiff's protected activity and Defendant's adverse actions, including through temporal proximity, ongoing antagonism following Plaintiff's complaints, and/or pretextual treatment, including a PIP.

104.    As a result of the foregoing, Defendant's conduct constitutes unlawful retaliation in violation of Title VII.

**COUNT IV**
**Violations of 42 U.S.C. Section 1981**
**(Retaliation)**

105.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

106.    Plaintiff complained, regarding comments, conduct, and workplace behavior that Plaintiff reasonably believed reflected discriminatory attitudes, stereotypes, and/or hostility concerning race, ethnicity, and protected characteristics.

107.    By opposing and reporting such conduct, Plaintiff engaged in protected activity under 42 U.S.C. § 1981.

108.    Following Plaintiff's complaints, Defendant failed to adequately address the discriminatory conduct and instead permitted continued antagonism, hostility, and adverse treatment toward Plaintiff.

109.    Plaintiff was abruptly terminated under false and pretextual circumstances as discussed *herein*.

16

110.    These actions constitute retaliation under Section 1981.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.    Defendant is to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B.    Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay, and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C.    Plaintiff is to be awarded punitive and/or liquidated damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant from engaging in such misconduct in the future;

D.    Plaintiff is to be accorded equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation);

E.    Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F.    Plaintiff demands trial by jury on all issues so triable consistent with Fed. R. Civ. P. 38(a)(1).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:

Ari R. Karpf, Esq. (91538)
Jeremy M. Cerutti, Esq. (200276)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
215-639-0801 (P)
215-639-4970 (F)
akarpf@karpf-law.com
jeremy@karpf-law.com

Dated: May 29, 2026

18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Vivian Bettencourt | : | CIVIL ACTION |
| v. | : | |
| The Boston Consulting Group, Inc. d/b/a Boston Consulting Group | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)  Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          (  )

(b)  Social Security – Cases requesting review of a decision of the Secretary of Health
  and Human Services denying plaintiff Social Security Benefits.          (  )

(c)  Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   (  )

(d)  Asbestos – Cases involving claims for personal injury or property damage from
  exposure to asbestos.          (  )

(e)  Special Management – Cases that do not fall into tracks (a) through (d) that are
  commonly referred to as complex and that need special or intense management by
  the court.  (See reverse side of this form for a detailed explanation of special
  management cases.)          (  )

(f)  Standard Management – Cases that do not fall into any one of the other tracks.     (x )

| | | |
|---|---|---|
| 5/29/2026 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

10/2024

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### DESIGNATION FORM

Place of Accident, Incident, or Transaction:    Defendants place of business

---

***RELATED CASE IF ANY:***  Case Number:_____    Judge:_____

1.  Does this case involve property included in an earlier numbered suit?    Yes ☐

2.  Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?    Yes ☐

3.  Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?    Yes ☐

4.  Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?    Yes ☐

5.  Is this case related to an earlier numbered suit even though none of the above categories apply?
    If yes, attach an explanation.    Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A.*  ***Federal Question Cases:***

☐  1.  Indemnity Contract, Marine Contract, and All Other Contracts)
☐  2.  FELA
☐  3.  Jones Act-Personal Injury
☐  4.  Antitrust
☐  5.  Wage and Hour Class Action/Collective Action
☐  6.  Patent
☐  7.  Copyright/Trademark
☐  8.  Employment
☐  9.  Labor-Management Relations
☒  10. Civil Rights
☐  11. Habeas Corpus
☐  12. Securities Cases
☐  13. Social Security Review Cases
☐  14. Qui Tam Cases
☐  15. Cases Seeking Systemic Relief  **\*see certification below\***
☐  16. All Other Federal Question Cases. *(Please specify)*:_____

*B.*  ***Diversity Jurisdiction Cases:***

☐  1.  Insurance Contract and Other Contracts
☐  2.  Airplane Personal Injury
☐  3.  Assault, Defamation
☐  4.  Marine Personal Injury
☐  5.  Motor Vehicle Personal Injury
☐  6.  Other Personal Injury *(Please specify)*:_____
☐  7.  Products Liability
☐  8.  All Other Diversity Cases:  *(Please specify)*_____
        _____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

### ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)

I certify that, to the best of my knowledge and belief:

☒  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

JS 44  (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

BETTENCOURT, VIVIAN

**(b)** County of Residence of First Listed Plaintiff   Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com

## DEFENDANTS

THE BOSTON CONSULTING GROUP, INC. D/B/A BOSTON CONSULTING GROUP
County of Residence of First Listed Defendant   Suffolk
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability   ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &   Pharmaceutical Slander   Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability   ☐ 368 Asbestos Personal ☐ 340 Marine   Injury Product ☐ 345 Marine Product   Liability | | ☐ 835 Patent – Abbreviated New Drug Application ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability   **PERSONAL PROPERTY** ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | **LABOR** ☐ 710 Fair Labor Standards | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury   ☐ 385 Property Damage ☐ 362 Personal Injury -   Product Liability Medical Malpractice | ☐ 740 Railway Labor Act ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/   Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☒ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty mployment   **Other:** | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of Agency Decision |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other Other   ☐ 550 Civil Rights ☐ 448 Education   ☐ 555 Prison Condition   ☐ 560 Civil Detainee -   Conditions of   Confinement | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | |
|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* |
| ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File | | | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
ADA (42USC12101); FMLA (29USC2601); Title VII (42USC2000); Section 1981 (42USC1981)

Brief description of cause:
Violations of the ADA, FMLA, Title VII, Section 1981, PHRA and PFPO.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE   5/29/2026

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____